1
2
3
4
5
6
7
8
9
10

BROWN, CLARK, LE, AMES, STEDMAN & CEVALLOS LLP
Edwin B. Brown [SBN 89447] (*Pro Hac Vice* forthcoming)
22342 Avenida Empresa, Suite 125
Rancho Santa Margarita, CA 92688
Phone: (949) 459-5900 Fax: (949) 713-7722
Email: edbrownlaw@gmail.com

KAPLAN COTTNER
KORY L. KAPLAN, ESQ.
Nevada Bar No. 13164
Email:  kory@kaplancottner.com
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
Telephone: (702) 381-8888
Facsimile: (702) 832-5559
*Attorneys for Plaintiff George Jaramillo, II*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| GEORGE JARAMILLO, II, an Individual | **Case No.:** |
| Plaintiff, | **COMPLAINT BY PLAINTIFF GEORGE JARAMILLO, II FOR:** |
| vs. | |
| AREA 15 LAS VEGAS LLC, a Delaware Limited Liability Company, AREA 15 GLOBAL LLC, a Delaware Limited Liability Company, ARNOLD FISHER, an Individual, KENNETH FISHER, an Individual, STEVEN FISHER, an Individual, WINSTON FISHER, an Individual, FISHER BROTHERS MANAGEMENT CO. LLC, a New York Limited Liability Company, FISHER BROTHERS FINANCIAL AND DEVELOPMENT COMPANY LLC, a New York Limited Liability Company, and DOES 1-50 Inclusive, | **1. DISCRIMINATION BASED ON RACE (42 U.S.C. § 2000E-2);** <br> **2. DISCRIMINATION BASED ON SEXUAL ORIENTATION (42 U.S.C. § 2000E-2);** <br> **3. HOSTILE WORK ENVIRONMENT;** <br> **4. RETALIATION;** <br> **5. WRONGFUL TERMINATION;** <br> **6. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;** <br> **7. DISCRIMINATION (NRS § 613.330);** <br> **8. DISCRIMINATION (42 U.S.C. § 1981);** <br> **9. FRAUD;** <br> **10. DEFAMATION PER SE;** <br> **11. BREACH OF CONTRACT; and** <br> **12. CONVERSION.** |
| Defendants. | **DEMAND FOR JURY TRIAL** |

**COMPLAINT**

1

Plaintiff GEORGE JARAMILLO ("Mr. Jaramillo") for his Complaint against Defendants AREA 15 LAS VEGAS LLC, AREA 15 GLOBAL LLC (collectively "AREA 15"), ARNOLD FISHER, KENNETH FISHER, STEVEN FISHER, WINSTON FISHER, FISHER BROTHERS MANAGEMENT CO. LLC, FISHER BROTHERS FINANCIAL AND DEVELOPMENT COMPANY LLC (collectively "Fisher"), and DOES 1-50, inclusive (collectively "Defendants"), complains and alleges as follows:

## JURISDICTION AND VENUE

1.     This is a civil complaint brought by George Jaramillo in the United States District Court under Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended by 42 U.S.C. 2000e-2 *et. seq.,* and the Civil Rights Act of 1866, 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991, federal statutes prohibiting discrimination in order to secure protection and redress deprivation of Mr. Jaramillo's rights under these laws. Jurisdiction of this Court is therefore invoked under 28 U.S.C. 1331.

2.     This action also includes claims arising out of Nevada anti-discrimination statutes, Nevada Revised Statutes ("NRS") 613.310 *et. seq*. Jurisdiction is also proper pursuant to NRS 14.065. These state claims are joined pursuant to the doctrine of supplemental jurisdiction and 28 U.S.C. 1367(a).

3.     Mr. Jaramillo asserts that he was treated disparately and subjected to a hostile work environment and retaliation due to his Hispanic ethnicity and sexual orientation, which is strictly prohibited under Title VII, Section 1981 and NRS 613.310.

4.     As Mr. Jaramillo's employers during the relevant time period, Defendants conducted business regularly and systematically in Clark County, Nevada. Defendants' improper conduct at issue occurred in whole or in part in Clark County, Nevada and engaged in an industry affecting commerce. Thus, pursuant to 28 U.S.C. 1391(b)(1), 28 U.S.C. 1391(b)(2), 28 U.S.C. 1391(c)(1) and 28 U.S.C. 1391(c)(2), venue is proper in the United States District Court for the District of Nevada.

5.     Mr. Jaramillo filed his Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on March 18, 2021. A true and correct copy of the charge is attached hereto as **Exhibit 1**.

6.     Mr. Jaramillo received a copy of his "Notice of Suit Rights" from the EEOC on March 23, 2021. A true and correct copy of the letter is attached hereto as **Exhibit 2**.  Mr. Jaramillo is in

1  fulfillment of all jurisdictional requirements for the filing of this lawsuit, including filing of this

2  lawsuit within ninety (90) days of his receipt of the Notice of Suit Rights.

3                                                  **THE PARTIES**

4      7.    Mr. Jaramillo is a gay, Hispanic male. At all times herein mentioned, he is and was a

5  resident of the County of Clark, State of Nevada.

6      8.    At all times herein mentioned, Defendants AREA 15 Las Vegas LLC and AREA 15

7  Global LLC are limited liability companies formed in Delaware and licensed to do business in Clark

   County, Nevada.

8      9.    At all times herein mentioned, Defendants Fisher Brothers Management Co. LLC and

9  Fisher Brothers Financial and Development Company LLC were New York limited liability

10 companies and were the owners and/or the managing entities for Defendants AREA 15 Las Vegas

11 LLC and AREA 15 Global LLC.

12     10.   At all times herein mentioned, Defendants Arnold Fisher, Kenneth Fisher, Steven

13 Fisher, and Winston Fisher were residents of the State of New York and were the owners and

   managers of Fisher Brothers Management Co. LLC and Fisher Brothers Financial and Development

14 Company LLC.

15     11.   Defendants own and/or operate "AREA 15," a new retail and entertainment complex

16 located at 3215 S. Rancho Drive, Las Vegas, Nevada 89102.

17     12.   As employers in the State of Nevada, Defendants are required to comply with all

18 Federal and State statutes, which prohibit harassment, discrimination, and retaliation based upon an

19 individual's race, ethnicity, and sexual orientation.

20     13.   The true names and capacities of Defendants DOES 1-50, inclusive, are unknown to

21 Mr. Jaramillo, who therefore sues said Defendants by such fictitious names. Each of the Defendants

22 designated herein as a DOE is legally responsible in some manner for the events and happenings

   herein referred to, and thereby caused injuries and damages to Mr. Jaramillo, as herein alleged. Mr.

23 Jaramillo will ask leave of Court to amend this Complaint to show their names and capacities when

24 they have been ascertained.

25     14.   At all times herein mentioned, Defendants were the agents, servants, and employees of

26 each other, and at all times pertinent hereto were acting within the course and scope of their authority

27 as agents, servants, and/or employees, and acting on implied and actual permission and consent.

28

                                                  **COMPLAINT**

                                                        3

**FACTS COMMON TO ALL CAUSES OF ACTION**

15.    In January 2019, Mr. Jaramillo was employed by Wynn Resorts. At that time, Defendants, told Mr. Jaramillo that they were looking to fill the position of Event Operations Manager for AREA 15, a new project in Las Vegas.

16.    Mr. Jaramillo was content at Wynn Resorts, Defendants persisted; they were insistent that Mr. Jaramillo would be a good fit for Defendants' new company. They said that Defendants were very well funded and would be more than happy to start Mr. Jaramillo at $100,000 per year or more.

17.    Mr. Jaramillo agreed to meet with Ryan Kruger ("Mr. Kruger"), Defendants' Managing Director of Events & Entertainment for AREA 15. Following that meeting, Mr. Kruger hired Mr. Jaramillo as AREA 15's Event Operations Manager, starting on March 18, 2019. Defendants agreed to pay Mr. Jaramillo a salary of $100,000 per year and a 20% annual bonus. Mr. Jaramillo's base salary would be reviewed for increases each January. A copy of AREA 15's signed offer letter to Mr. Jaramillo is attached as **Exhibit 3**.

18.    Mr. Kruger was Mr. Jaramillo's supervisor at AREA 15. Mr. Kruger, Defendants' Managing Director of Events & Entertainment for AREA 15, was responsible not only for managing Mr. Jaramillo but also for building what would be the events department at AREA 15.

19.    Mr. Kruger is Canadian and initially lived with his family in Toronto, Canada, not Las Vegas. Mr. Kruger would travel to Las Vegas from Toronto for a week or so at a time. Mr. Jaramillo was tasked by AREA 15 to screen applicants who would be hired to report to Mr. Kruger, like, for example, the head of talent. Mr. Jaramillo determined who was potentially a good hire and would forward those applicants to Mr. Kruger.

20.    AREA 15's Senior Sales Manager, Josh Baro ("Mr. Baro"), became a nonstop source of problems in the AREA 15 office. For example, **Mr. Baro once ran into Mr. Jaramillo's office waving a handgun**. Obviously, this made Mr. Jaramillo very uncomfortable in light of the recent mass shooting that took place in Las Vegas. Mr. Jaramillo made it abundantly clear to Mr. Baro that he did not approve of Mr. Baro bringing his firearm to work. Mr. Jaramillo told Mr. Baro to take his weapon out of the office. Mr. Jaramillo told Mr. Kruger and James Heilmann ("Mr. Heilmann"), AREA 15's General Manager, about this incident. Mr. Kruger said he would "deal with it" because he also did not approve of an employee bringing a gun to work.

**COMPLAINT**

4

21.    AREA 15's General Manager, Mr. Heilmann, was dismissive of Mr. Jaramillo's suggestion to hire a Human Resources Manager for Area 15. Mr. Heilmann also lacked concern regarding office safety, saying that Mr. Jaramillo overreacted to Mr. Baro's handgun, and further stating that "it was not a big deal."

22.    Incredibly, Mr. Heilmann told Mr. Jaramillo he did not have anything to worry about because "Josh (Mr. Baro) only shoots cans." When Mr. Jaramillo looked puzzled at the statement, Mr. Heilmann clarified, "You know… **MexiCANS, AfriCANS, Puerto RiCANS"**, insinuating and encouraging racist behavior. Mr. Heilmann then just laughed. Mr. Jaramillo told Mr. Heilmann how incredibly inappropriate his response was and expressed his offense at such racist remarks (especially in light of Mr. Jaramillo's Hispanic heritage), but Mr. Heilmann just laughed louder, almost in an exaggerated fashion.

23.    On another occasion, Mr. Baro shared **insulting and demeaning jokes about Jews** with a Jewish AREA 15 employee, Lindsey Allen ("Ms. Allen"). Ms. Allen was AREA 15's Food and Beverage Manager. In an effort to get Mr. Baro to stop making these religious jokes, Ms. Allen told Mr. Baro she was Jewish. However, Mr. Baro just "doubled-down" by firing off more jokes in quick succession.

24.    Another AREA 15 employee, Art Lindsay ("Mr. Lindsay"), became so uncomfortable for Ms. Allen that he stopped what he was doing and demanded that Mr. Baro immediately leave their office.

25.    When Mr. Lindsay told Mr. Heilmann about Mr. Baro's discriminatory jokes, Mr. Heilmann said he would deal with it. But Mr. Heilmann did nothing about it. Mr. Lindsay and Ms. Allen then brought the issue to Mr. Jaramillo who emailed Mr. Kruger to let him know about Mr. Baro's inappropriate behavior. A copy of Mr. Jaramillo's email to Mr. Kruger is attached as **Exhibit 4**.

26.    Mr. Kruger responded to Mr. Jaramillo's email by stating that he was deeply troubled by Mr. Baro's comments. Mr. Kruger assured Mr. Jaramillo he would address the incident with both AREA 15's Chief Operating Officer, Dan Pelson ("Mr. Pelson"), and Mr. Baro.

27.    Mr. Heilmann, on the other hand, did not like the fact that Mr. Jaramillo told Mr. Kruger about Mr. Baro's discriminatory jokes. Mr. Heilmann told Mr. Jaramillo, "**People like you are so easily offended,**" and "**you all get your panties in a wad over nothing.**" Mr. Heilmann added that, "**Jews in *this* place seem to be doing just fine.**"

**COMPLAINT**

28.    Time and time again, Mssrs. Heilmann, Pelson, Mark Stutzman ("Mr. Stutzman"), AREA 15's CTO, and other leaders in the company simply excused Mr. Baro's behavior saying that "**Baro's [behavior] was worth it if he could produce sales**."

29.    Mr. Lindsay became frustrated at Mssrs. Heilmann, Pelson and Stutzmans' refusal to do anything about the uncomfortable and hostile office environment created by Mr. Baro's inappropriate behaviors. He complained and pointed out Defendants' other inappropriate conduct, stating, "**Dropping off duffle bags of cash" was not the appropriate way to deal with city officials**.

30.    Mr. Baro, knowing that Mr. Jaramillo was gay and knowing that Chick-fil-A restaurant is notoriously anti-LGBT+, frequently proclaimed to the entire office that "**I'm on my way to eat at Chick-fil-A for lunch.**" He did so intentionally within earshot of Mr. Jaramillo.

31.    As far as Mr. Jaramillo knows, he was the only gay person in the office at the time. Mr. Jaramillo is informed and believes that Mr. Baro made the comments to annoy and anger Mr. Jaramillo. Mr. Jaramillo told Mr. Baro that these loud references to Chick-fil-A were offensive and asked Baro not to make them. However, Mr. Baro ignored Mr. Jaramillo's requests.

32.    On one occasion, after hearing Mr. Baro's Chick-fil-A reference, Mr. Heilmann came into Mr. Jaramillo's office and closed the door behind him. Mr. Heilmann told Mr. Jaramillo he should **keep his "gayness" to himself around "the guys" because "we don't like that.**" Mr. Jaramillo was shocked by Mr. Heilmann's outrageous request.

33.    Mr. Jaramillo responded to Mr. Heilmann by telling him that he kept his personal life private; it was Mr. Baro who repeatedly harassed him for being gay. Mr. Heilmann walked away from Mr. Jaramillo stating, "**Guys will be guys and gays will be gays.**"

34.    During the setup for an AREA 15 event on March 10, 2020, Mr. Jaramillo mentioned to Mr. Baro and Mr. Heilmann that, although construction was not complete, there were a lot of laborers setting up for the event. Mr. Baro and Mr. Heilmann thought Mr. Jaramillo was of Mexican heritage (Mr. Jaramillo is, in fact, of Ecuadorian descent) and, therefore, responded loudly that "**it was a good thing that we have all those Mexicans out there**" and "they better hurry to be ready for the party." Mr. Heilmann also loudly stated to Mr. Jaramillo, "**That's what Mexicans are for – to do our work**!" Mr. Baro and Mr. Heilmann then both laughed.

//

**COMPLAINT**

6

35.    Mr. Baro made other racist remarks. After he shaved his head, he made a joke on a Zoom call about his new "**skinhead**" appearance that made Black AREA 15 employee, Sequoah Turner ("Ms. Turner"), very uncomfortable.

36.    Both Ms. Turner and Mr. Jaramillo asked Mr. Heilmann and Howard Weiss ("Mr. Weiss") to address this "skinhead" comment with Mr. Baro. Mr. Heilmann replied that **Sequoah (Ms. Turner) was "pulling the race card" again** and did not see how the incident was offensive.

37.    Defendants gave Mr. Jaramillo a raise to "thank [him] for [his] hard work and contributions to the team." Defendants told Mr. Jaramillo to keep Mr. Heilmann in the loop because he did not know the first thing about events.

38.    Defendants also gave Mr. Jaramillo additional responsibility, including an additional employee to supervise. Defendants also promoted Mr. Jaramillo to "Director of Event Operations." Defendants told Mr. Jaramillo his pay would be increased to $175,000, plus a bonus structure. Mr. Weiss, Victoria Paul ("Ms. Paul"), and Ms. Turner were also promoted to Directors. However, Ms. Turner was **paid less money than Ms. Paul, her white subordinate, and Mr. Jaramillo was paid less than Mr. Weiss, his white peer**.

39.    Mr. Jaramillo was scheduled to receive his first paycheck after his raise on April 16, 2020. However, Defendants rescinded the raise, allegedly due to COVID-related budget cuts. That made no sense. AREA 15 was not even open and operating at that time and, therefore, was not affected by the pandemic. Nevertheless, Defendants told Mr. Jaramillo that everyone at AREA 15 who was making $100,000 or more would be getting a 10% pay cut. Mr. Jaramillo therefore ended up making less money than he was when he was originally hired. Mr. Jaramillo had to stop contributions to his 401(k) plan to account for Defendants' unilateral retraction.

40.    Mr. Heilmann's response to the hardship of the pay cut was to tell Mr. Jaramillo, "Think of it this way; this is an investment in your future. Not only will you **be here for as long as you want,** you'll be making much more than $175,000 after COVID."

41.    Shortly after Mr. Heilmann told Mr. Jaramillo he would be at AREA 15 as long as he wanted, **Defendants fired Sarah, a lesbian, and Helen, an Asian-American woman over 40**.

42.    There were troubling differences in pay among employees at AREA 15. Personal friends of owner Winston Fisher or AREA 15 Chief Creative Officer Michael Beneville ("Mr. Beneville") made more money than employees who were not their friends. **Black employees, like Ms. Turner and Mr. Lindsay, were significantly underpaid** in comparison to other AREA 15

COMPLAINT

7

employees in similarly situated positions. **AREA 15 also paid Mr. Jaramillo less than straight, white coworkers** in similarly situated positions. Nevertheless, and despite Mr. Jaramillo's repeated suggestions that an HR person be brought on-board, Mr. Heilmann was adamant that it was not a priority for him.

43.    On June 23, 2020, Mr. Heilmann asked to meet privately with Mr. Jaramillo. When Mr. Jaramillo told Mr. Heilmann he was worried that the meeting was called so that Mr. Heilmann could fire him, given the recent firings of minorities/homosexual employees, Mr. Heilmann told Mr. Jaramillo, "[You aren't] going anywhere … **you'll be here as long as you want to be.**"

44.    During this June 23, 2020 meeting, Mr. Jaramillo told Mr. Heilmann it was not right that some AREA 15 employees made substantially less money than others. Mr. Heilmann falsely stated that everyone at the Director level made the same amount of money. But Mr. Jaramillo knew that the salaries for Ms. Paul, Ms. Turner and himself were nowhere near the amount of money that others, such as Mr. Weiss, received.

45.    Mr. Jaramillo also raised concerns about Mr. Baro's inappropriate comments. Mr. Heilmann ended the meeting by telling Mr. Jaramillo that "**Someone like you should be happy to have a job at all.**"

46.    One week later, on June 30, 2020, during a Zoom call with Mr. Weiss, Glenn Turell, Defendants' Vice President of Finance, and Robert, AREA 15's new Controller, Mr. Heilmann took the opportunity to inaccurately point out that Mr. Jaramillo had "dropped the ball" in getting AREA 15's liquor storage area built out and approved by the City of Las Vegas. Mr. Heilmann could not have been more wrong. The liquor storage project had been assigned to Ms. Paul, not Mr. Jaramillo, and the project was well under way. Mr. Jaramillo calmly reminded Mr. Heilmann of that fact. But Mr. Heilmann was unphased. He persisted in stating that Mr. Jaramillo "dropped the ball" and needed to handle the situation.

47.    After the Zoom meeting, Mr. Heilmann called Mr. Jaramillo. Mr. Heilmann was livid. He told Mr. Jaramillo that "**a Mexican fag" like [you] had "no place backtalking his boss in front of the guys.**" Mr. Heilmann's use of the term "the guys" meant to exclude Mr. Jaramillo because **a gay male of Hispanic origin would never be one of "the guys."**

48.    Mr. Jaramillo was shocked and truly traumatized by Mr. Heilmann's unfettered attack. Finally, Mr. Heilmann insulted Mr. Jaramillo again by asking him in a sarcastic tone, "**comprende?**"

1   Mr. Heilmann meant these derogatory comments to discriminate against Mr. Jaramillo because of his
2   race and sexual orientation.

3       49.     Unable to obtain redress or any meaningful dialogue with Mr. Heilmann, on
4   Wednesday, July 8, 2020, Mr. Jaramillo reached out to Mr. Pelson to schedule a conversation to
5   address his concerns. Mr. Pelson responded in short order that same day. The next morning - July 9,
    2020 - Mr. Pelson's assistant confirmed with Mr. Jaramillo that his meeting with Mr. Pelson was set
6   for that Tuesday, July 14, 2020. A copy of the email is attached as **Exhibit 5**.

7       50.     On the morning of July 10, 2020, Mr. Heilmann suddenly terminated Mr. Jaramillo's
8   employment via Zoom. The reason Mr. Heilmann gave Mr. Jaramillo for firing him was … **no**
9   **reason at all**. Mr. Heilmann said, "**Sometimes it is better not to get into reasons and details.**"

10      51.     After firing Mr. Jaramillo, Mr. Heilmann initially **refused to allow Mr. Jaramillo to**
11  **retrieve his personal property** from his office. Later, Mr. Heilmann relented and said a time could
12  be arranged for Mr. Jaramillo to obtain his personal items from his office. A copy of the email is
13  attached hereto as **Exhibit 6.**

14      52.     Mr. Jaramillo was shocked by his termination. He had never been fired from any other
15  job. Defendants had always told Mr. Jaramillo, from the date of his hire at AREA 15, that he was a
    fantastic employee. Defendants had promoted Mr. Jaramillo to Director and had given him a raise.
16  Everyone under Mr. Jaramillo's supervision, as well as community members and others, sang Mr.
17  Jaramillo's praises.

18      53.     The only written review Defendants ever gave Mr. Jaramillo during his employment
19  gave him excellent marks. Defendants never so much as hinted to Mr. Jaramillo that he needed to
20  improve in any area of his employment.

21      54.     After Defendants fired Mr. Jaramillo, some AREA 15 employees said that Mr.
22  Heilmann told them that Mr. Jaramillo had quit. Others said that after Mr. Jaramillo was fired, Mr.
    Heilmann asked them to make a list of "all the balls Mr. Jaramillo had dropped." When AREA 15
23  could not come up with any reason for firing Mr. Jaramillo, Mr. Heilmann also told people that Mr.
24  Jaramillo had a bad attitude and did not need to work anyway. Others still told Mr. Jaramillo that Mr.
25  Heilmann was trying to justify Mr. Jaramillo's firing after the fact.

26      55.     Of course, the truth is that Mr. Jaramillo did not quit, and did not "drop any balls" in
27  his work for AREA 15. In fact, AREA 15's General Counsel, presumably unaware that Mr. Heilmann

28

**COMPLAINT**

9

had fired Mr. Jaramillo, and having been told Mr. Jaramillo quit his job, reached out to Mr. Jaramillo with a kind, complimentary email. A copy of the email is attached hereto as **Exhibit 7**.

56.     On the day of his termination, Mr. Jaramillo sent an email to AREA 15 CEO, Winston Fisher, Mr. Beneville, Mr. Heilmann, and Mr. Pelson outlining issues and concerns that had arisen and that were, in fact, the reason for his requested meeting with Mr. Pelson made prior to his sudden termination. A copy of the email is attached hereto as **Exhibit 8**.

57.     Susan Dalton ("Ms. Dalton"), the Human Resources Director for AREA 15's parent company, Fisher Brothers, responded to Mr. Jaramillo's email advising Mr. Jaramillo that he would be receiving information concerning his COBRA rights. A copy of the email is attached hereto as **Exhibit 9**.

58.     It took more than one month for Fisher Brothers to send Mr. Jaramillo COBRA forms. Mr. Jaramillo has still not received his full final paycheck.

59.     Following Ms. Dalton's July 14, 2020 reply to Mr. Jaramillo's July 10, 2020 email, there was no further communication with Defendants until Mr. Jaramillo reached out on August 12, 2020. At that point, Mr. Jaramillo was yet to receive any update on the status of Defendants' "investigation" of his mistreatment. Defendants had also failed to pay Mr. Jaramillo properly upon his termination or to send him his COBRA paperwork, as required. A copy of his email is attached as **Exhibit 10.**

60.     On the next day, August 13, 2020, Ms. Dalton emailed Mr. Jaramillo that she had sent him a direct deposit in the amount of $3,112.62, which she stated was his "final check." A copy of the email is attached hereto as **Exhibit 11**. Ms. Dalton also claimed she had sent Mr. Jaramillo his COBRA paperwork on July 20, 2020 and attached a letter that was supposedly sent to him on that date. A copy of the letter Ms. Dalton claimed was sent to Mr. Jaramillo is attached as **Exhibit 12**.

61.     Ms. Dalton's July 20, 2020 letter was misaddressed. Mr. Jaramillo believes the letter was intentionally misaddressed so that it would not be deliverable, thus intentionally withholding important information regarding Mr. Jaramillo's medical insurance during a global pandemic. Defendants also never gave Mr. Jaramillo the W-2 form they owed him.

62.     Mr. Jaramillo had provided Defendants with his accurate address on various forms since being hired. Mr. Jaramillo has suffered from asthma his entire life and had other health-related issues.

**COMPLAINT**

63.     In her same August 13, 2020 email, Ms. Dalton falsely insinuated that Mr. Jaramillo was unwilling to return company property despite "several attempts" to contact him. The truth is that Defendants never made any attempt to contact Mr. Jaramillo, aside from having Mr. Weiss text him regarding Defendants' return of Mr. Jaramillo's belongings and collection of AREA 15 property.

64.     Ms. Dalton closed her email by thanking Mr. Jaramillo for bringing "potential issues in the office" to her attention and noted that Defendants "immediately took action on [his] complaint." Ms. Dalton's statement could not be true <u>since Defendants never contacted Mr. Jaramillo to obtain information about his complaints</u>.

65.     On August 14, 2020, Mr. Jaramillo advised Ms. Dalton that she was mistaken with regard to his final pay, his still outstanding COBRA information, and his still unreturned property. Mr. Jaramillo again requested his complete personnel file in an effort to ascertain some reason for his termination aside from Mr. Heilmann's distaste for his Hispanic ethnicity and sexual orientation. A copy of the email is attached as **Exhibit 13**.

66.     On the evening of August 14, 2020, Mr. Jaramillo finally received his COBRA paperwork. A copy of the shipping paperwork is attached hereto as **Exhibit 14**.

67.     On August 18, 2020, Mr. Jaramillo gave Mr. Weiss a box containing all of the AREA 15 property in Mr. Jaramillo's possession (i.e., computer and accessories, key fob, work cell phone, and accessories, etc.). Mr. Weiss expressed various concerns about AREA 15 and Mr. Jaramillo's situation. Mr. Weiss said that Mr. Heilmann had taken the box of Mr. Jaramillo's belongings from Mr. Weiss for a while and then returned them. **<u>Mr. Weiss confirmed to Mr. Jaramillo that he had not been guilty of any misconduct and had not "dropped any balls" at AREA 15. Mr. Weiss said that AREA 15's leadership is a "mess.</u>"**

68.     Once Mr. Jaramillo looked through the box of belongings that Mr. Weiss had returned to him, it was apparent that **<u>someone at AREA 15 had stolen some of Mr. Jaramillo's personal property</u>** from his AREA 15 office.

69.     Mr. Jaramillo's property that was stolen by agents of AREA 15, include the following:

      A.     A greeting card from Glenn Turell, Defendants' Vice President of Finance, saying what a pleasure it was to work with Mr. Jaramillo;

      B.     A composition notebook in which Mr. Jaramillo kept notes of, among other things, his mistreatment and ongoing issues at AREA 15;

**COMPLAINT**

11

C.      Mr. Jaramillo's signed copy of his glowing performance review from his direct supervisor, which was the reason for his annual bonus;

D.      A certificate from Wynn Resorts outlining Mr. Jaramillo's stellar performance for that employer;

E.      An unopened bottle of Whiskey given to Mr. Jaramillo by Art Lindsay before his departure from Area 15;

F.      Approximately 275 valuable business cards from various industry contacts; and

G.      Mr. Jaramillo's wireless phone charger.

70.     Mr. Jaramillo described the missing property to Ms. Dalton in an email. A copy of the email is attached as **Exhibit 15**.

71.     Mr. Jaramillo needed all of these items returned. It was most concerning to him that his notebook was missing. He believes that Mr. Heilmann saw it and realized what it would mean for him. Mr. Heilmann therefore had to dispose of it.

72.     On August 21, 2020, Mr. Jaramillo emailed Ms. Dalton to advise her that Defendants had still not completely paid him what he was owed; that his personal property was still missing; and that, despite his multiple previous requests, Defendants had not given him a copy of his personnel file. A copy of the email is attached hereto as **Exhibit 16**.

73.     On August 21, 2020, Mr. Jaramillo received an email from Marc Bernstein, Partner, Employment Law Department, at the Paul Hastings law firm ("Mr. Bernstein"), stating that he had been "asked to look into the matters [Mr. Jaramillo] raised." A copy of Mr. Bernstein's email is attached hereto as **Exhibit 17**.

74.     Mr. Bernstein admitted that he had sent a previous letter to Mr. Jaramillo at an incorrect email address. The improperly addressed email, a copy of which is attached hereto as **Exhibit 18**, stated that Defendants had paid Mr. Jaramillo the correct amount. But, because it was paid late, Mr. Jaramillo was due more money. Mr. Bernstein also stated that Defendants were not late sending Mr. Jaramillo COBRA information. Finally, the improperly addressed letter stated that Mr. Jaramillo would be receiving a copy of his personnel file before the legal due date via overnight mail. However, Defendants did not overnight mail Mr. Jaramillo's personnel file.

75.     Mr. Bernstein also copied-and-pasted an old email from Mr. Heilmann, a copy of which is attached hereto as **Exhibit 19**, outlining an unclear list of PTO policies that were never

explained. One bullet point from that Exhibit 20 was bolded and read "This is all subject to change." However, Mr. Bernstein un-bolded that portion before forwarding that email to Mr. Jaramillo.

76.     On August 26, 2020, Mr. Jaramillo emailed Ms. Dalton to advise that he had received correspondence from Defendants' lawyer, who was operating with false information from Defendants. Mr. Jaramillo also advised Ms. Dalton that Defendants had still not sent him a copy of his personnel file and his missing property. Mr. Jaramillo also put Ms. Dalton on notice that Mr. Heilmann and other AREA 15 employees were hard at work trying to backfill his personnel file with entries, attempting to justify his unlawful termination. A copy of the email is attached hereto as **Exhibit 20**.

77.     Ms. Dalton claimed that she tried to call Mr. Jaramillo. A copy of Ms. Dalton's email is attached hereto as **Exhibit 21**. However, by this point it was abundantly clear that Defendants had no interest in finding out the truth about Mr. Jaramillo's wrongful termination, nor in treating him fairly.

78.     Mr. Jaramillo replied to Ms. Dalton that a telephone call was unnecessary but to please just send him his personnel file and missing property. A copy of Mr. Jaramillo's email is attached hereto as **Exhibit 22**.

79.     On August 28, 2020, Ms. Dalton emailed Mr. Jaramillo stating that he would be receiving a FedEx package with his business cards that had not been previously returned to him. Ms. Dalton added that Defendants allegedly had nothing else from Mr. Jaramillo's list of stolen property and that he should never have left personal property in the office. Nevertheless, Defendants were offering Mr. Jaramillo a check for $300 to compensate him for the property they stole from him. Ms. Dalton asked Mr. Jaramillo to confirm his agreement to that offered resolution. A copy of Ms. Dalton's email is attached hereto as **Exhibit 23**.

80.     Ms. Dalton's email also contained what she called Mr. Jaramillo's "complete personnel file." Ms. Dalton asserted that Mr. Jaramillo was fired because he "did not meet our business expectations and had nothing to do with your request to meet with Mr. [Pelson]." A copy of the enclosure is attached hereto as **Exhibit 24**.

81.     Mr. Jaramillo never advised Defendants that he agreed to accept $300, as if that would actually compensate him for the loss of his invaluable notebook, performance evaluation and other stolen property. Nevertheless, Defendants wired $300 into Mr. Jaramillo's personal bank account without permission.

**COMPLAINT**

13

82.   On August 29, 2020, Mr. Jaramillo advised Ms. Dalton that Exhibit 25 did not constitute a complete personnel file, regardless of what she called it. Specifically missing from the file were Mr. Jaramillo's only performance review, documentation of his merit-based bonus, documentation of his raise, and documentation of his subsequent promotion. A copy of the email is attached hereto as **Exhibit 25**.

83.   On September 2, 2020, Ms. Dalton replied with an email clearly written by Defendants' lawyer that quoted law. Ms. Dalton falsely claimed Mr. Jaramillo was "never promoted;" that "your responsibilities remained the same;" that Mr. Jaramillo was terminated for "poor performance;" and that, "as a gesture of good faith," Defendants would forward a check for $300 to compensate Mr. Jaramillo for his stolen property. A copy of Ms. Dalton's email is attached hereto as **Exhibit 26**.

84.   Defendants' assertion that Mr. Jaramillo's responsibilities had not changed was a blatant lie. Mr. Jaramillo had been assigned another person who reported to him, namely Valmira Mavraj, Creative Director of Events ("Ms. Mavraj"). Ms. Mavraj was Mr. Beneville's girlfriend. Mr. Jaramillo had also been given additional responsibility by Mr. Heilmann and Mr. Pelson, including the following:

A.   Overseeing menu development for the Todd English food hall;

B.   Working with tenants and Mr. Clark, a Fisher employee, to make sure food and beverage needs were being met during lease negotiations for prospective tenants;

C.   Working with the team developing Oddwood to make sure that was on track; and

D.   Working with the City to finalize liquor storage permitting, which responsibility Defendants had shifted from Victoria to Mr. Jaramillo.

85.   Defendants, through Ms. Dalton, also falsely claimed that Mr. Jaramillo was not promoted. Ms. Mavraj, Mr. Beneville's girlfriend, was a Director making $100,000 per year and Mr. Jaramillo was a manager making the same amount of money. When Defendants asked Ms. Mavraj to report to Mr. Jaramillo, he was given a Director title and had already been given a $10,000 raise by Mr. Pelson so that he would make more money than the person who reported to him. That was clearly a promotion.

**COMPLAINT**

14

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

86.     Mr. Weiss also specifically refused to have Ms. Mavraj report to him because of the complication of Mr. Beneville's girlfriend being an AREA 15 employee. He thought it inappropriate for Defendants' executives to place their overpaid loved ones into positions they should not have.

87.     On September 2, 2020, Mr. Jaramillo again asked Defendants to return his performance evaluation and to reaffirm that he had been promoted. Mr. Jaramillo questioned Defendants "new" reason for his termination given the fact that Defendants had never told Mr. Jaramillo he had a "poor performance" at AREA 15. A copy of the email is attached hereto as **Exhibit 27**.

88.     On September 11, 2020, Mr. Jaramillo advised Defendants that they had still not yet given him the "opportunity to inspect [his] personnel file." He also requested a full record of his wages and tried to ascertain whether or not Winston Fisher's collection of glass eyeballs was safely returned to him. Mr. Jaramillo wanted to ensure that Mr. Fisher's valuable, albeit gruesome, "art piece" was also not gone. A copy of the email is attached hereto as **Exhibit 28**.

89.     On September 18, 2020, Defendants' attorney, Mr. Bernstein, replied to Mr. Jaramillo's September 11, 2020 email, advising that Defendants were under no obligation to provide any more documentation to Mr. Jaramillo. He was nevertheless attaching Mr. Jaramillo's performance review. Mr. Bernstein made sure to note that the review was completed by a "consultant [Mr. Kruger] who was terminated." Mr. Bernstein told Mr. Jaramillo that the glass eye art that Winston Fisher had entrusted to Mr. Jaramillo was "Mr. Fisher's concern not yours." A copy of the email is attached hereto as **Exhibit 29**.

90.     Mr. Kruger, who gave Mr. Jaramillo his performance review, was AREA 15's Managing Director of Entertainment and Events (see Exhibit 4). Thus, notwithstanding Mr. Bernstein's statement regarding Mr. Kruger, he was clearly Defendants' managing director and Mr. Jaramillo's boss.

91.     Because Defendants had still not given Mr. Jaramillo his complete personnel file, Mr. Jaramillo again reached out to Defendants on September 22, 2020 and asked for the complete file. Mr. Jaramillo also asked Ms. Dalton for a copy of a record of his wages which Defendants had also failed to provide him. A copy of the email is attached hereto as **Exhibit 30**.

92.     Mr. Bernstein replied to Mr. Jaramillo on behalf of the Defendants stating that Mr. Jaramillo had received all that he was entitled to and not to communicate again with Ms. Dalton. Mr.

Bernstein added that no one at Area 15 would be responding to him anymore. A copy of the email is attached hereto as **Exhibit 31**.

93.     Because Mr. Jaramillo lacked the means or interest in getting a lawyer, he again reached out to Ms. Dalton, telling her he was not looking to engage lawyers but simply wanted Defendants to send him a signed copy of his performance evaluation and record of wages. A copy of the email is attached hereto as **Exhibit 32**.

94.     In a most disparaging email, Mr. Bernstein told Mr. Jaramillo that he "**continue[s] to not understand** [his] correspondence," and that Mr. Jaramillo "must contact [him], not the company," if he wanted anything further." A copy of the email is attached hereto as **Exhibit 33**.

95.     Feeling sufficiently humiliated by Mr. Bernstein, Mr. Jaramillo advised Ms. Dalton that Defendants' attorney had taken a page from Mr. Baro and Mr. Heilmann by **speaking to Mr. Jaramillo in a racially charged and bullying tone that Mr. Jaramillo would no longer tolerate**. Mr. Jaramillo again asked for his personnel file, wage records, and stolen property. A copy of the email is attached hereto as **Exhibit 34**.

96.     Because it was clear by then that Defendants were not going to do the right thing by returning Mr. Jaramillo's stolen property, Mr. Jaramillo, on September 24, 2020, filed a police report with the Las Vegas Metropolitan Police Department. A copy of the police report is attached hereto as **Exhibit 35**.

97.     Ms. Dalton emailed Mr. Jaramillo to defend Defendants' attorney. She wrongly claimed that Defendants had sent Mr. Jaramillo his personnel file and that there was "no other documentation to be sent;" that Defendants did not have a signed copy of Mr. Jaramillo's evaluation as completed by Mr. Kruger; and that it was not Defendants' intention to disparage or tarnish Mr. Jaramillo's reputation. A copy of the email is attached hereto as **Exhibit 36**.

98.     Ms. Dalton attached to her email a non-disclosure agreement that Defendants asked Mr. Jaramillo to sign if he wanted to receive unemployment benefits. Knowing that Mr. Jaramillo could not sign the agreement, Defendants sent it in an attempt to prevent Mr. Jaramillo from receiving unemployment benefits. A copy of the proposed non-disclosure agreement is attached hereto as **Exhibit 37**.

99.     While Mr. Jaramillo was eligible for unemployment benefits since the end of July 2020, he did not receive a single cent for over four (4) months. The stress of going months without income to which he was entitled was severe.

**COMPLAINT**

16

100.    On November 16, 2020, the Nevada Unemployment Insurance Office advised Mr. Jaramillo that "You were discharged due to poor work performance. The employer did not cite the details regarding a specific final incident or prior incidents and warnings. You state that you were not informed of a final incident that caused your discharge. As misconduct in connection with the work has not been established, no disqualification will be assessed." A copy of the notice is attached hereto as **Exhibit 38**.

101.    Defendants have literally, for now and for the foreseeable future, without any basis, destroyed Mr. Jaramillo's professional life. Defendants have ruined Mr. Jaramillo's reputation, which is key in Mr. Jaramillo's profession of event planning and hospitality. It is almost impossible to come back from a wrongful termination during the Covid-19 pandemic. There are no jobs like the one Mr. Jaramillo held.

102.    Although Defendants touted Area 15 as a paragon of acceptance and tolerance, the reality is that Area 15 is a perfect example of how blatant prejudice, harassment, and discrimination can harm people, as it did Mr. Jaramillo and other employees at Area 15. The Fishers, the billionaire owners of Area 15, run Area 15 in a way that shows that the lives of their white, male, straight employees matter but the lives of women, people of color, and LGBT+ employees do not matter.

**FIRST CLAIM FOR RELIEF**
**EMPLOYMENT DISCRIMINATION BASED ON RACE**
**TITLE VII (42 U.S.C. § 2000e-2)**
**AGAINST ALL DEFENDANTS**

103.    Mr. Jaramillo re-alleges each and every allegation in paragraphs 1 through 101 with the same force and effect as though fully set forth herein.

104.    Section 703 of Title VII, 42 U.S.C. § 2000e-2, prohibits employment practices that discriminate against persons on the basis of their race or ethnicity.

105.    Defendants knew or should have known of their obligation, pursuant to Federal and State statutes, to maintain a workplace free of ethnic discrimination.

106.    Defendants failed to take reasonably adequate steps to prevent discrimination based upon race and ethnicity in its workplace in the State of Nevada.

107.    Defendants knew at all times that Mr. Jaramillo was of Hispanic origin. Defendants, acting through and with its employees, subjected Mr. Jaramillo to disparate treatment and a hostile work environment, including, but not limited to, making remarks intended to humiliate Mr. Jaramillo,

**COMPLAINT**

17

denying Mr. Jaramillo benefits, and denying Mr. Jaramillo the same rights and privileges of other employees due to his Hispanic ethnicity.

108.    Defendants' discriminatory remarks include, but are not limited to:

A.    "Josh only shoots 'cans' … you know… MexiCANS, AfriCANS, Puerto RiCANS;"

B.    "People like you are so easily offended;"

C.    "It's a good thing that we have all those Mexicans out there … that's what Mexicans are for – to do our work!"

D.    "A Mexican fag" like you has no place backtalking his boss in front of the guys;" and

E    "Someone like you should be happy to have a job at all."

109.    Defendants' remarks were intended to humiliate and intimidate Mr. Jaramillo.

110.    Defendants further exemplified ethnic discrimination by paying employees of color less than White, male employees.

111.    Defendants, acting through and with their employees and agents, discriminated illegally against Mr. Jaramillo because their remarks were not directed to similarly situated non-Hispanic employees.

112.    As a direct and proximate result of Defendants' unlawful conduct, Mr. Jaramillo suffered damages and is entitled to compensation for loss of enjoyment of life, mental and emotional pain and suffering, economic loss, and other related costs, which with reasonable probability will be experienced and/or required in the future, in excess of $75,000.00.

113.    The acts, conduct, and behavior of Defendants were performed knowingly and intentionally and were malicious, oppressive, and in reckless disregard of Mr. Jaramillo's rights, entitling him to punitive damages.

114.    As a direct and proximate result of Defendants' actions, Mr. Jaramillo has been required to retain the services of an attorney to prosecute this claim, and is entitled to be compensated for any costs incurred in the prosecution of this action, including without limitation, any and all costs and attorney's fees.

//

//

//

**COMPLAINT**

18

## SECOND CLAIM FOR RELIEF
## EMPLOYMENT DISCRIMINATION BASED ON SEXUAL ORIENTATION
## TITLE VII (42 U.S.C. § 2000e-2)
## AGAINST ALL DEFENDANTS

115.    Mr. Jaramillo re-alleges each and every allegation in paragraphs 1 through 113 with the same force and effect as though fully set forth herein.

116.    Section 703 of Title VII, 42 U.S.C. § 2000e-2, prohibits employment practices that discriminate against persons on the basis of their sexual orientation.

117.    Defendants knew or should have known of their obligation, pursuant to Federal and State statutes, to maintain a workplace free of sexual orientation discrimination.

118.    Defendants failed to take reasonably adequate steps to prevent discrimination based upon sexual orientation in its workplace in the State of Nevada.

119.    Defendants, at all times relevant, knew that Mr. Jaramillo was gay. Defendants, acting through and with its employees, subjected Mr. Jaramillo to disparate treatment and a hostile work environment, including, but not limited to, making remarks intended to humiliate Mr. Jaramillo, denying Mr. Jaramillo benefits, and denying Mr. Jaramillo the same rights and privileges of other employees due to his sexual orientation.

120.    Defendants' discriminatory remarks include, but are not limited to:

    A.    "People like you are so easily offended;"

    B.    "Keep your "gayness" to yourself around "the guys" because "we don't like that;"

    C.    "Guys will be guys and gays will be gays;"

    D.    "A Mexican fag" like you has no place backtalking his boss in front of the guys;"

    E.    "Don't get your panties in a twist;" and

    F.    "Someone like you should be happy to have a job at all."

121.    Defendants' remarks were intended to humiliate and intimidate Mr. Jaramillo simply because he is gay.

122.    Defendants, acting through and with their employees, discriminated illegally against Mr. Jaramillo because their remarks were not directed to similarly situated non-gay employees.

123.    As a direct and proximate result of Defendants' unlawful conduct, Mr. Jaramillo suffered damages and is entitled to compensation for loss of enjoyment of life, mental and emotional

**COMPLAINT**

19

pain and suffering, economic loss, and other related costs which with reasonable probability will be experienced and/or required in the future, in excess of $75,000.00.

124.    The acts, conduct, and behavior of Defendants were performed knowingly and intentionally and were malicious, oppressive and in reckless disregard of Mr. Jaramillo's rights, entitling him to punitive damages.

125.    As a direct and proximate result of Defendants' actions, Mr. Jaramillo has been required to retain the services of an attorney to prosecute this claim and is entitled to be compensated for any costs incurred in the prosecution of this action, including without limitation, any and all costs and attorney's fees.

**THIRD CLAIM FOR RELIEF**
**HOSTILE WORK ENVIRONMENT**
**TITLE VII (42 U.S.C. § 2000e-2)**
**AGAINST ALL DEFENDANTS**

126.    Mr. Jaramillo re-alleges each and every allegation in paragraphs 1 through 124 with the same force and effect as though fully set forth herein.

127.    Section 703 of Title VII, 42 U.S.C. § 2000e-2, prohibits employment practices that discriminate against persons on the basis of their race, ethnicity or sexual orientation.

128.    Defendants knew or should have known of their obligation, pursuant to Federal and State statutes, to maintain a workplace free of discrimination.

129.    Defendants knew at all times that Mr. Jaramillo was gay and of Hispanic origin. Defendants, acting through and with their employees, subjected Mr. Jaramillo to disparate treatment and a hostile work environment, including but not limited to making remarks intended to humiliate Mr. Jaramillo, denying Mr. Jaramillo benefits, and denying Mr. Jaramillo the same rights and privileges of other employees due to his sexual orientation and Hispanic ethnicity.

130.    Defendants' remarks were intended to humiliate and intimidate Mr. Jaramillo. The remarks were unwelcomed by Mr. Jaramillo and were sufficiently severe and pervasive so as to alter the conditions of Mr. Jaramillo's employment and create an abusive working environment.

131.    Defendants' comments and actions were so severe and pervasive as to pollute Mr. Jaramillo's workplace, making it more difficult for him to do his job, take pride in his work, and desire to stay in his position.

132.    As a direct and proximate result of Defendants' unlawful conduct, Mr. Jaramillo suffered damages and is entitled to compensation for loss of enjoyment of life, mental and emotional

**COMPLAINT**

20

pain and suffering, economic loss, and other related costs which with reasonable probability will be experienced and/or required in the future, in excess of $75,000.00.

133.   The acts, conduct, and behavior of Defendants were performed knowingly and intentionally and were malicious, oppressive and in reckless disregard of Mr. Jaramillo's rights, entitling him to punitive damages.

134.   As a direct and proximate result of Defendants' actions, Mr. Jaramillo has been required to retain the services of an attorney to prosecute this claim and is entitled to be compensated for any costs incurred in the prosecution of this action, including without limitation, any and all costs and attorney's fees.

**FOURTH CLAIM FOR RELIEF**
**RETALIATION FOR REPORTING DISCRIMINATION**
**BASED ON RACE**
**TITLE VII (42 U.S.C. § 2000e-2)**
**AGAINST ALL DEFENDANTS**

135.   Mr. Jaramillo re-alleges each and every allegation in paragraphs 1 through 133 with the same force and effect as though fully set forth herein.

136.   Mr. Jaramillo complained to management of AREA 15 of the unlawful employment practices that discriminate against persons on the bases of their sexual orientation, race, and ethnicity.

137.   There was a causal link between Mr. Jaramillo complaining about discrimination and his termination. In other words, Defendants retaliated against Mr. Jaramillo's protected reporting of discrimination by firing him.

138.   Mr. Jaramillo would not have been fired if he had not reported Defendants' unlawful discrimination.

139.   As a direct and proximate result of Defendants' unlawful conduct, Mr. Jaramillo suffered damages and is entitled to compensation for loss of enjoyment of life, mental and emotional pain and suffering, economic loss, and other related costs which, with reasonable probability, will be experienced and/or required in the future, in excess of $75,000.00.

140.   The acts, conduct, and behavior of Defendants were performed knowingly and intentionally and were malicious, oppressive and in reckless disregard of Mr. Jaramillo's rights, entitling him to punitive damages.

141.   As a direct and proximate result of Defendants' actions, Mr. Jaramillo has been required to retain the services of an attorney to prosecute this claim and is entitled to be compensated

**COMPLAINT**

21

1  for any costs incurred in the prosecution of this action including, without limitation, any and all costs

2  and attorney's fees.

### FIFTH CLAIM FOR RELIEF
### WRONGFUL TERMINATION
### AGAINST DEFENDANTS AREA 15 AND DOES 1-7

142.    Mr. Jaramillo re-alleges each and every allegation in paragraphs 1 through 140 with the same force and effect as though fully set forth herein.

143.    Defendants AREA 15 AND DOES 1-7 engaged in discriminatory, retaliatory, and wrongful acts based upon Mr. Jaramillo's Hispanic ethnicity and sexual orientation.

144.    Mr. Jaramillo expressed his concern to Defendants about this disparate treatment and harassing conduct and his ability to receive the same terms, conditions, and bonus payments of similarly situated employees.

145.    Defendants AREA 15 AND DOES 1-7, through their employees, including Mr. Heilmann, specifically promised Mr. Jaramillo that he could remain employed at AREA 15 "as long as he wanted to be."

146.    Defendants AREA 15 AND DOES 1-7 promoted Mr. Jaramillo and gave him a raise. Defendants gave Mr. Jaramillo a glowing performance evaluation.

147.    After receiving Mr. Jaramillo's complaints regarding pervasive discrimination, Defendants AREA 15 AND DOES 1-7 engaged in discriminatory and retaliatory conduct by discharging Mr. Jaramillo.

148.    These discriminatory and retaliatory acts violate the public policy of the State of Nevada.

149.    As a direct and proximate result of Defendants AREA 15 AND DOES 1-7's unlawful conduct, Mr. Jaramillo has been damaged in an amount to be proven at trial in excess of $75,000.00, plus pre- and post-judgment interest.

150.    The acts, conduct, and behavior of Defendants AREA 15 AND DOES 1-7 were performed knowingly and intentionally and were malicious, oppressive and in reckless disregard of Mr. Jaramillo's rights, entitling him to punitive damages.

151.    As a direct and proximate result of Defendants AREA 15 AND DOES 1-7's actions, Mr. Jaramillo has been required to retain the services of an attorney to prosecute this claim and is

entitled to be compensated for any costs incurred in the prosecution of this action including, without limitation, any and all costs and attorney's fees.

**SIXTH CLAIM FOR RELIEF**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**AGAINST ALL DEFENDANTS**

152.    Mr. Jaramillo re-alleges each and every allegation in paragraphs 1 through 149 with the same force and effect as though fully set forth herein.

153.    Defendants' conduct was extreme and outrageous and performed with reckless disregard that such actions would cause emotional distress to Mr. Jaramillo.

154.    Mr. Jaramillo suffered severe and extreme emotional distress as the direct and proximate result of Defendants' conduct in an amount to be proven at trial in excess of $75,000.00, plus pre- and post-judgment interest.

155.    The acts, conduct, and behavior of Defendants were performed knowingly and intentionally and were malicious, oppressive and in reckless disregard of Mr. Jaramillo's rights, entitling him to punitive damages.

156.    As a direct and proximate result of Defendants' actions, Mr. Jaramillo has been required to retain the services of an attorney to prosecute this claim and is entitled to be compensated for any costs incurred in the prosecution.

**SEVENTH CLAIM FOR RELIEF**
**DISCRIMINATION PURSUANT TO NRS 613.330 et. seq.**
**AGAINST ALL DEFENDANTS**

157.    Mr. Jaramillo re-alleges each and every allegation in paragraphs 1 through 154 with the same force and effect as though fully set forth herein.

158.    The discrimination, denial of benefits, and retaliatory actions by Defendants due to Mr. Jaramillo's Hispanic ethnicity and sexual orientation constitute unlawful discriminatory employment practices under the Nevada Equal Employment Opportunity Act – NRS 633.310 *et. seq.*

159.    Mr. Jaramillo suffered severe and extreme emotional distress as the direct and proximate result of Defendants' conduct in an amount to be proven at trial in excess of $75,000.00, plus pre- and post-judgment interest.

160.    The acts, conduct, and behavior of Defendants were performed knowingly and intentionally and were malicious, oppressive, and in reckless disregard of Mr. Jaramillo's rights, entitling him to punitive damages.

**COMPLAINT**

161.    As a direct and proximate result of Defendants' actions, Mr. Jaramillo has been required to retain the services of an attorney to prosecute this claim and is entitled to be compensated for any costs incurred in the prosecution

**EIGHTH CLAIM FOR RELIEF**
**DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981**
**AGAINST ALL DEFENDANTS**

162.    Mr. Jaramillo re-alleges each and every allegation in paragraphs 1 through 159 with the same force and effect as though fully set forth herein.

163.    Defendants' discrimination against Mr. Jaramillo is in violation of the rights of Mr. Jaramillo afforded him by the Civil Rights Act of 1866, 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991.

164.    Defendants knew or should have known of their obligation, pursuant to Federal and State statutes, to maintain a workplace free of discrimination based on race, ethnicity and sexual orientation.

165.    Defendants failed to take reasonably adequate steps to prevent discrimination based upon race, ethnicity and sexual orientation in its workplace in the State of Nevada.

166.    Defendants, acting through and with their employees and agents, subjected Mr. Jaramillo to disparate treatment and a hostile work environment including, but not limited to, making remarks intended to humiliate Mr. Jaramillo, denying Mr. Jaramillo benefits, and denying Mr. Jaramillo the same rights and privileges of other employees due to his Hispanic ethnicity and sexual orientation.

167.    Defendants' discriminatory remarks include, but are not limited to:

A.    "Josh only shoots cans … you know… MexiCANS, AfriCANS, Puerto RiCANS;"

B.    "People like you are so easily offended;"

C.    "It's a good thing that we have all those Mexicans out there … that's what Mexicans are for – to do our work!"

D.    "A Mexican fag" like you has no place backtalking his boss in front of the guys;"

E.    "Keep your "gayness" to yourself around "the guys" because "we don't like that;"

**COMPLAINT**

24

F.    "Guys will be guys and gays will be gays;" and

G.    "Someone like you should be happy to have a job at all."

168.    Defendants' remarks were intended to humiliate and intimidate Mr. Jaramillo.

169.    Defendants further exemplified their ethnic discrimination by paying employees of color less than white, straight, male employees.

170.    Defendants, acting through and with their employees, discriminated illegally against Mr. Jaramillo because their remarks were not directed to similarly situated non-Hispanic and straight employees.

171.    As a direct and proximate result of Defendants' unlawful conduct, Mr. Jaramillo suffered damages and is entitled to compensation for loss of enjoyment of life, mental and emotional pain and suffering, economic loss, and other related costs which, with reasonable probability, will be experienced and/or required in the future, in excess of $75,000.00.

172.    The acts, conduct, and behavior of Defendants were performed knowingly and intentionally and were malicious, oppressive and in reckless disregard of Mr. Jaramillo's rights, entitling him to punitive damages.

173.    As a direct and proximate result of Defendants' actions, Mr. Jaramillo has been required to retain the services of an attorney to prosecute this claim and is entitled to be compensated for any costs incurred in the prosecution of this action including, without limitation, any and all costs and attorney's fees.

### NINTH CLAIM FOR RELIEF
### FRAUD
### AGAINST ALL DEFENDANTS

174.    Mr. Jaramillo re-alleges each and every allegation in paragraphs 1 to 171 with the same force and effect as though fully set forth herein.

175.    In January 2019, Mr. Jaramillo was employed by Wynn Resorts. At that time, Defendants told Mr. Jaramillo that they were looking to fill the position of event operations manager for a new project in Las Vegas.

176.    Mr. Jaramillo was content at Wynn Resorts, but Defendants persisted; they were insistent that Mr. Jaramillo would be a good fit for Defendants' new company. They said that Defendants were very well funded and would be more than happy to start Mr. Jaramillo at $100,000 per year or more. Defendants influenced, persuaded, and induced Mr. Jaramillo to leave his job at Wynn and join Defendants through false or deceptive representations and/or false pretenses.

### COMPLAINT

177.    Defendants hired Mr. Jaramillo as AREA 15's Event Operations Manager, starting on March 18, 2019. Defendants agreed to pay Mr. Jaramillo a salary of $100,000 per year and a 20% annual bonus. Mr. Jaramillo's base salary would be reviewed for increases each January.

178.    The reality is that, after they hired Mr. Jaramillo, Defendants reduced his salary, not increased it. Thus, when Defendants' agents recruited Mr. Jaramillo by telling him Defendants were "very well-funded," Defendants misled Mr. Jaramillo into believing that being worth billions, they could weather economic downturns like the global pandemic without reducing Mr. Jaramillo's salary.

179.    Regarding Defendants' decrease in Mr. Jaramillo's pay, Mr. Heilmann continued to mislead Mr. Jaramillo. He told Mr. Jaramillo, "[You aren't] going anywhere" and that Mr. Jaramillo would be there "as long as you want to be." Mr. Heilmann said, "Think of it this way; this is an investment in your future. Not only will you be here for as long as you want, but you'll be making much more than $175,000 after COVID."

180.    These statements were not true. Defendants paid Mr. Jaramillo less than straight, white coworkers. Mr. Heilmann falsely stated that everyone made the same amount of money. But Mr. Heilmann knew that Mr. Jaramillo's salary was nowhere near the amount of money others received.

181.    Thus, Defendants' representations, through their agents, James Heilmann, and others, were false and Defendants knew and/or should have known the falsity of these statements at the time they were made.

182.    Defendants never had any intention of paying Mr. Jaramillo what they promised him. Defendants then unlawfully terminated Mr. Jaramillo when he complained of the disparate treatment and discrimination.

183.    Mr. Jaramillo relied on the representations of Defendants and otherwise would not have accepted employment with Defendants or remained employed by them, but for their repeated promises to him.

184.    Mr. Jaramillo is informed and believes that Defendants performed a background check and researched his success and reputation as an events manager on Linked-In. Defendants used Mr. Jaramillo because of his reputation at Wynn to boost the image of AREA 15, then deprived Mr. Jaramillo of the payments and promotions they had promised him.

185.    Defendants, through their discriminatory and fraudulent agent, Mr. Heilmann, defrauded Mr. Jaramillo of his promised salary, bonuses, and job at AREA 15 "for as long as he wanted."

**COMPLAINT**

26

186.    As a proximate result of the unlawful conduct of Defendants, Mr. Jaramillo has sustained and will continue to sustain economic damages in excess of $75,000 in the form of current and future loss of income, bonuses, 401k contributions, and other employment-related benefits in an amount to be determined according to proof at trial.

187.    As a proximate result of the unlawful conduct of Defendants, Mr. Jaramillo has also been damaged by loss of reputation and loss of ability to compete at the highest levels as he once did in his industry.

188.    As a further proximate result of the unlawful conduct of Defendants, Mr. Jaramillo has also sustained emotional and mental damages as a result of his anxiety, loss of self-esteem, loss of self-confidence, embarrassment, humiliation, worry, and mental distress, all in an amount to be determined by proof at trial.

189.    As a further proximate result of the aforementioned wrongful conduct, Mr. Jaramillo has had to employ the services of attorneys to pursue his legal rights. Mr. Jaramillo therefore prays for reasonable costs and attorney fees against Defendants for his prosecution of this action.

190.    The fraudulent, oppressive, and malicious manner in which Defendants engaged in the fraud, as described in this cause of action, additionally entitles Mr. Jaramillo to punitive damages in an amount to be determined according to proof at trial.

## TENTH CLAIM FOR RELIEF
## DEFAMATION PER SE
### AGAINST ALL DEFENDANTS

191.    Mr. Jaramillo re-alleges each and every allegation in paragraphs 1 to 188 with the same force and effect as though fully set forth herein.

192.    Defendants, through their agents, made false and defamatory statements to third parties, concerning Mr. Jaramillo. Those statements included that Mr. Jaramillo was terminated for cause. AREA 15 also told others that Mr. Jaramillo quit his job. Defendants told others still that Mr. Jaramillo was not competent in the performance of his duties at AREA 15. Defendants knew or in the exercise of reasonable care should have known, that those statements were false. Defendants intended for third parties to falsely believe that Mr. Jaramillo was an incompetent employee.

193.    As a proximate result of the unlawful conduct of Defendants, Mr. Jaramillo has sustained and will continue to sustain economic damages in excess of $75,000.00 in the form of current and future loss of income, bonuses, 401K contributions, and other employment-related benefits, in an amount to be determined according to proof at trial.

COMPLAINT

194.    As a proximate result of the unlawful conduct of Defendants, Mr. Jaramillo has also been damaged by loss of reputation and loss of ability to compete at the highest levels, as he once did in his industry.

195.    As a further proximate result of the unlawful conduct of Defendants, Mr. Jaramillo has also sustained emotional and mental damages as a result of his anxiety, loss of self-esteem, loss of self-confidence, embarrassment, humiliation, worry, and mental distress, all in an amount to be determined by proof at trial.

196.    As a further proximate result of the aforementioned wrongful conduct, Mr. Jaramillo has had to employ the services of attorneys to pursue his legal rights. Mr. Jaramillo therefore prays for reasonable costs and attorney fees against Defendants for his prosecution of this action.

197.    The fraudulent oppressive, and malicious manner in which Defendants engaged in the fraud, as described in this cause of action, additionally entitles Mr. Jaramillo to punitive damages in an amount to be determined according to proof at trial.

**ELEVENTH CLAIM FOR RELIEF**
**BREACH OF EMPLOYMENT CONTRACT**
**AGAINST DEFENDANTS AREA 15 AND DOES 1-10**

198.    Mr. Jaramillo re-alleges each and every allegation in paragraphs 1 to 195 with the same force and effect as though fully set forth herein.

199.    Notwithstanding Mr. Jaramillo's written Offer of Employment with Defendants, Mr. Jaramillo was not an "at-will" employee. Defendants hired Mr. Jaramillo as an executive – the AREA 15 Events Operations Manager. Defendants tasked Mr. Jaramillo with the responsibility for building what would be the event department at AREA 15. Because Mr. Jaramillo was a Manager and department head at AREA 15, Defendants could only terminate Mr. Jaramillo's employment for cause.

200.    Defendants terminated Mr. Jaramillo in retaliation for his complaints about AREA 15 discrimination based on race, ethnicity, and sexual orientation, not because he was an at-will employee.

201.    Defendants, through their agent, Mr. Heilmann, promised Mr. Jaramillo he would have a job at AREA 15 for as long as he wanted. Therefore, Defendants could not fire Mr. Jaramillo as an at-will employee.

**COMPLAINT**

28

202.    By terminating Mr. Jaramillo's employment with AREA 15, Defendants breached their employment agreement with Mr. Jaramillo and violated federal and Nevada law.

203.    Defendants' termination of Mr. Jaramillo's employment was a substantial factor in causing damage to Mr. Jaramillo by the loss of his salary at AREA 15, as well as bonuses, vacation and personal pay, health insurance coverage, 401K plan contributions, and other employment-related benefits.

204.    As a further result of Defendants' breach, Mr. Jaramillo is deprived of his future salary, bonuses, and other employment-related benefits.

**TWELFTH CLAIM FOR RELIEF**
**CONVERSION OF PERSONAL PROPERTY**
**AGAINST ALL DEFENDANTS**

205.    Mr. Jaramillo re-alleges each and every allegation in paragraphs 1 to 202 with the same force and effect as though fully set forth herein.

206.    Mr. Jaramillo was given exclusive use of an office during his employment at AREA 15. Mr. Jaramillo kept personal belongings in his exclusive-use office including:

    A.    A greeting card from Glenn Turell, Defendants' Vice President of Finance, saying what a pleasure it was to work with Mr. Jaramillo;

    B.    A composition notebook in which Mr. Jaramillo kept notes of, among other things, his mistreatment and ongoing issues at AREA 15;

    C.    Mr. Jaramillo's signed copy of his glowing performance review from his direct supervisor, which was the reason for his annual bonus;

    D.    A certificate from Wynn Resorts outlining Mr. Jaramillo's stellar performance for that employer;

    E.    An unopened bottle of Whiskey given to Mr. Jaramillo by Art Lindsay before his departure;

    F.    Approximately 275 valuable business cards from various industry contacts; and

    G.    Mr. Jaramillo's wireless phone charger.

207.    Defendants terminated Mr. Jaramillo's employment with AREA 15, while Mr. Jaramillo was working from home during the COVID-19 pandemic. After Defendants fired Mr. Jaramillo, they refused his reasonable request to come into the AREA 15 office to retrieve his

**COMPLAINT**

29

personal property. Mr. Jaramillo nevertheless requested that Defendants immediately return his property to him.

208.    After Defendants failed to return his personal belongings, Mr. Jaramillo complained to Defendants that they had no right to keep his property. Defendants then returned to Mr. Jaramillo only some of his property, namely, 178 of his 275 business cards. Defendants converted to their own use, and for their own purposes, Mr. Jaramillo's greeting card from Glen; black & white ruled composition notebook containing numerous entries; signed copy of his performance review; Star Employee Award from Wynn Resorts; unopened bottle of whiskey from coworker, Art; and personal phone charger.

209.    Despite repeated demands, Defendants have still failed to return Mr. Jaramillo's personal property.

210.    Defendants' action of wrongfully exerting dominion over Mr. Jaramillo's personal property, inconsistent with his title and rights thereto, and in defiance of such title and rights, constitutes a conversion of Mr. Jaramillo's property.

211.    Mr. Jaramillo prays for return of his property by Defendants.

212.    As a result of Defendant's conversion, Mr. Jaramillo has lost the value of his property from the time of conversion, plus interest, in excess of $75,000.00

213.    As a further result of Defendants' conversion, Mr. Jaramillo has sustained consequential damages other than loss of interest.

WHEREFORE, PLAINTIFF prays for judgment to be entered in his favor and against each of the Defendants as follow:

1.  For special damages in excess of $75,000.00 for lost wages, bonuses, vacation pay, 401K compensation and other compensatory, economic, and special damages according to proof at trial, together with interest, penalties, and costs;

2.  For general and non-economic damages in excess of $75,000.00 according to proof at trial;

3.  For attorney's fees according to proof at trial;

4.  For punitive damages in excess of $75,000.00, as allowed by law and according to proof at trial;

5.  For return of PLAINTIFF's personal property, loss of use of the property, and

**COMPLAINT**

30

consequential damages;

6. For pre-judgment interest at the prevailing legal rate;

7. For costs of suit; and

8. For such other and further relief as this Court deems just and proper.


**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.


Dated:  May 5, 2021          BROWN CLARK LE AMES STEDMAN & CEVALLOS LLP



By:/s/ Kory L. Kaplan
_____

Edwin B. Brown [SBN 89447] (*Pro Hac Vice* forthcoming)
22342 Avenida Empresa, Suite 125
Rancho Santa Margarita, CA 92688

KAPLAN COTTNER
KORY L. KAPLAN, ESQ.
Nevada Bar No. 13164
850 E. Bonneville Ave.
Las Vegas, Nevada 89101
*Attorneys for Plaintiff George Jaramillo*


**COMPLAINT**